MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2019 ME 84
Docket:       Pen-18-283
Argued:       April 10, 2019
Decided:      May 30, 2019

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

MICHAEL D. HOLMES et al.

v.

EASTERN MAINE MEDICAL CENTER et al.

GORMAN, J.

[¶1]  Michael D. and Debra A. Holmes appeal from a summary judgment entered by the Superior Court (Penobscot County, *Anderson, J.*) in favor of Spectrum Medical Group and one of its radiologists, Guillermo Olivos, M.D., on the Holmeses' medical malpractice claims, as well as from the court's judgment, entered on a jury verdict, for Eastern Maine Medical Center (EMMC) and one of its surgeons, Michael St. Jean, M.D., on those same claims.  We affirm the judgments.

2

## I. BACKGROUND

A.   Facts[1]

[¶2]   On August 14, 2012, a surgical oncologist at EMMC removed a noncancerous polyp from Michael's colon.  Michael was discharged from EMMC four days later, on August 18, 2012.

[¶3]  On August 20, 2012, at approximately 5:00 p.m., Michael went to the EMMC emergency department complaining of abdominal pain.  At 7:00 p.m., Michael was seen by the on-call surgeon—St. Jean.  Because he believed Michael was suffering from a postoperative ileus,[2] St. Jean ordered a CT scan of Michael's abdomen to rule out the possibility of active bleeding or an anastomotic leak.[3]

---

[1] Because Olivos's motion for summary judgment was granted and because St. Jean's was denied and the claims against him proceeded to trial, there are two different standards by which we review the evidence on appeal.  With respect to the Holmeses' appeal of the court's grant of a summary judgment for Olivos, we view the undisputed material facts in the light most favorable to the nonprevailing party, here, the Holmeses.  *See Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 12, 140 A.3d 1242.  With respect to the Holmeses' appeal of the judgment in favor of St. Jean, however, we view the evidence in the record in the light most favorable to the jury's verdict.  *See Darling's Auto Mall v. Gen. Motors LLC*, 2016 ME 48, ¶ 2, 135 A.3d 819.  Because the facts established at trial are similar to the record at summary judgment and, more importantly, because this opinion focuses on the summary judgment issue, the facts we include below are undisputed material facts taken from the summary judgment record.

[2] An "ileus" was described by St. Jean as "when the intestinal track slows down due to some other condition."

[3]  The anastomotic leak described here was, in lay terms, "a leak of the bowel contents at the junction of the two portions of the bowel that were surgically reconnected" during surgery to remove the polyp.

[¶4]   Michael had a CT scan taken of his abdomen at 9:30 p.m. Approximately one hour later, a radiologist interpreted the results of the CT scan and concluded that there was evidence of moderate to severe abdominal ascites,[4] which were "concerning for developing infection versus phlegmonous[5] changes."  The  report was faxed to EMMC at 10:37 p.m.

[¶5]   At approximately 8:00 the following morning, August 21, 2012, Olivos reviewed the CT scan of Michael's abdomen taken the previous night.  In his report, Olivos identified pelvic ascites, noted some dots of air in the ascites near the liver, and also stated that "[t]here [were] no findings to suggest an anastomotic leak."

[¶6]   At approximately 9:40 p.m. on August 21, 2012, Michael was observed by a second surgeon—one of St. Jean's partners—to have fast, shallow breathing, pain, and a distended and tender abdomen; based on these symptoms, this second surgeon determined that Michael's condition warranted immediate exploratory surgery.  She began the surgery at 10:55 p.m. and, in the course of that surgery, discovered a small anastomotic leak, which she believed

---

[4]  "Ascites" is an "[a]ccumulation of serous fluid in the peritoneal cavity."  *Ascites*, Stedman's Medical Dictionary (27th ed. 2000).

[5]  A "phlegmon" is an "[a]cute suppurative inflammation of the subcutaneous connective tissue." *Phlegmon*, Stedman's Medical Dictionary (24th ed. 1982).

4

had infected the fluid and blood in the abdomen, causing Michael's "septic state."

[¶7]   After this second surgery, Michael was hospitalized until October 1, 2012.  While hospitalized, Michael was intubated for a prolonged period of time and eventually underwent a tracheostomy.   Michael also developed deep venous thrombosis and was diagnosed with a stroke during the hospitalization at EMMC.

B.    Procedure

[¶8]  In May of 2015, the Holmeses filed notice of their professional negligence claim against EMMC, St. Jean, Northeast Surgery of Maine, Spectrum, and Olivos[6] in the Superior Court (Penobscot County) pursuant to the Maine Health Security Act (MHSA), 24 M.R.S. §§ 2501-2988 (2018), alleging one count of medical malpractice in connection with the complications that Michael suffered after he arrived at EMMC on August 20, 2012.  *See* 24 M.R.S. §§ 2853, 2903; M.R. Civ. P. 80M(b).  On November 18, 2016, a hearing was held before

---

[6] For simplicity's sake, in the remainder of this opinion we will refer only to the physicians, and not to the institutions employing them, because (1) all claims against Northeast Surgery were dismissed by agreement of the parties before closing arguments; (2) the issue of whether Spectrum was vicariously liable for the actions of Olivos was never determined because the court granted summary judgment on these claims; and (3) the issue of whether EMMC was vicariously liable for the actions of St. Jean was never determined by the jury.

the prelitigation screening panel at which all parties introduced evidence and presented expert witnesses. *See* 24 M.R.S. § 2854; M.R. Civ. P. 80M(g).[7]

[¶9]   On December 15, 2016, the Holmeses filed their complaint for medical malpractice against St. Jean and Olivos in the Superior Court. *See* 24 M.R.S. § 2859.   After the completion of discovery, Olivos and St. Jean each separately moved for summary judgment. *See* M.R. Civ. P. 56.  In the documents filed in support of, and in opposition to, the motions, the parties referred to the deposition testimony of the general surgeon and neurologist whom the Holmeses had designated as expert witnesses.

[¶10]   At his deposition, the general surgeon testified that had the anastomotic leak been identified and treated during the evening of August 20, 2012, some harm to Michael could have been avoided, including the prolonged hospitalization, prolonged intubation, tracheostomy, and deep venous thrombosis.  Specifically, he testified that it was "more likely than not" that Michael "would have had fewer postoperative complications" had the second surgery occurred twenty-four hours earlier, at approximately 8:00 p.m.

---

[7] Because all proceedings before prelitigation screening panels are generally "private and confidential," and because those proceedings do not affect this opinion, we do not discuss the panel's final determinations. *See* 24 M.R.S. § 2857 (2018); M.R. Civ. P. 80M(g)(10).

on August 20, 2012. The neurologist testified at his deposition that had the second surgery occurred sooner, it was more likely than not that Michael could have avoided the stroke.

[¶11] After a hearing, by order dated May 21, 2018, the court denied St. Jean's motion, but granted Olivos's motion. In its order granting a summary judgment for Olivos, the trial court referred to the deposition testimony from the Holmeses' expert witnesses. It stated:

> Here, Dr. Olivos did not become involved in the matter until well after the time [the surgical expert] testified was critical to avoiding . . . some of the significant complications suffered by Mr. Holmes. On this record, the Court concludes that plaintiffs cannot adequately establish through expert testimony that it is more likely than not that any negligence attributable to Dr. Olivos and Spectrum Medical Group caused harm to Mr. Holmes. . . .
>
> To be clear, however, the Court does not accept, and does not rule, that the passage of 8:00 pm on August 20, 2012 was an absolute "cut off" point for the establishment of adequate causation. The standard to be applied is "more likely than not." Sepsis brought on by the kind of bowel leak at issue here is clearly a progressive condition with worsening effects, as plaintiffs' expert has testified, and medical intervention would be warranted sooner than later. The Court simply concludes that the involvement of Dr. Olivos is too removed in space and time, well after a period plaintiffs' expert testified was a critical juncture, such that it is unreasonable to allow a jury to make the requisite finding of proximate cause. The Court believes a jury's deliberation on the involvement of Dr. Olivos would venture into the realm of conjecture or speculation disapproved of in *Merriam*. *See Merriam* [*v. Wanger*], 2000 ME 159, ¶ 10, 757 A.2d 778 ("Proximate cause is generally a question of fact [f]or the jury, but the court has a duty

to direct a verdict for the defendant if the jury's deliberation rests only on speculation or conjecture[.]") (citations omitted).

Here, the Court concludes that the required expert testimony falls short of the necessary legal threshold of proximate cause with respect to Dr. Olivos and Spectrum Medical Group.

[¶12] Thereafter, in June of 2018, the court conducted a nine-day jury trial on the Holmeses' malpractice claim against St. Jean. On June 21, 2018, the jury returned a verdict for St. Jean,[8] and one week later the court entered a judgment on the verdict. The Holmeses timely appealed. *See* 14 M.R.S. § 1851 (2018); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶13] The Holmeses argue that the court erred in granting Olivos's motion for summary judgment.[9] Specifically, the Holmeses assert that there was "evidence in the record upon which a factfinder could reasonably decide that Dr. Olivos'[s] negligent reading of the critical CT scan caused delay in

---

[8] The jury delivered its verdict via a special verdict form that asked, "Was Dr. St. Jean negligent, and was the negligence a cause of injury and damage to Mr. Holmes?" The jury answered "no" to this question and thus did not complete the rest of the form.

[9] The Holmeses also assert that the court erred in its determinations concerning (1) expert witness fees; (2) the use of panel findings at trial; (3) expert witness testimony at trial; and (4) the "lost chance" doctrine. Because we do not find any of these arguments persuasive, we do not discuss them further.

necessary treatment" and that this delay was a proximate cause of Michael's injuries.

[¶14] "We review the grant of a motion for summary judgment de novo, and consider both the evidence and any reasonable inferences that the evidence produces in the light most favorable to the party against whom the summary judgment has been granted in order to determine if there is a genuine issue of material fact." *Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 12, 140 A.3d 1242 (quotation marks omitted); M.R. Civ. P. 56(c). Our review of the evidence is a narrow one, focused on "the parties' statements of material facts and the record evidence to which the statements refer." *Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 18, 116 A.3d 466; *see also* Alexander, *Maine Appellate Practice* § 512 at 431 (5th ed. 2018).

[¶15] "A fact is material if it has the potential to affect the outcome of the suit, and a genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive. However, when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a [summary] judgment." *Grant*, 2016 ME 85, ¶ 12, 140 A.3d 1242 (citations omitted) (quotation marks omitted).

[¶16]  Where, as here, "the moving party is the defendant, the burden rests on that party to show that the evidence fails to establish a prima facie case for each element of the cause of action."  *Budge v. Town of Millinocket*, 2012 ME 122, ¶ 12, 55 A.3d 484 (quotation marks omitted).  If the defendant succeeds, "[i]t then becomes the plaintiff's burden to make out the prima facie case and demonstrate that there are disputed facts."  *Estate of Cabatit v. Canders*, 2014 ME 133, ¶ 8, 105 A.3d 439.

[¶17]  "In order to establish liability in a medical malpractice case, the plaintiff must show that the defendant's departure from a recognized standard of care was the proximate cause of the injury."  *Phillips v. E. Me. Med. Ctr.*, 565 A.2d 306, 307 (Me. 1989).  "Proximate cause is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred."  *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778 (quotation marks omitted).  Evidence is sufficient to support a finding of proximate cause in the medical malpractice context if the evidence and inferences that may reasonably be drawn from it indicate that (1) the defendant's negligent conduct played a substantial part in causing the injury, and (2) the injury was either a direct result or a reasonably foreseeable consequence of that conduct. *Id.* ¶¶ 8, 17.

[¶18]   Here, the trial court correctly determined that, based on the undisputed facts, the Holmeses failed to establish a prima facie case for negligence against Olivos.  Michael's anastomotic leak began before he arrived at EMMC's emergency room on August 20, 2012.  Olivos did not review the CT scan of Michael's abdomen until 8:00 a.m. on August 21, 2012; this was approximately fifteen hours after Michael arrived at EMMC and approximately twelve hours after the time identified by the Holmeses' surgical expert— 8:00 p.m. on August 20, 2012—when the surgery needed to have been completed in order to avoid Michael's postoperative complications.

[¶19]   Although the trial court, quite properly, did not take 8:00 p.m. on August 20, 2012, as the absolute point in time for the establishment of adequate causation, the experts' opinions—including the statements by the Holmeses' surgical expert—informed the court's decision and must inform ours.  In the Holmeses' opposing statements of material facts filed in response to Olivos's statements of material facts and motion for summary judgment, the Holmeses repeatedly referred to their own surgical expert's deposition.  In those statements, the Holmeses asserted as undisputed facts that

> [the expert] clearly testified that, more likely than not, because the medical condition was progressive and developing, effectively a sliding scale applied wherein surgery performed earlier than [the second surgeon's] actual surgery would have had

some benefit in terms of improving the potential for a better outcome, or as [the expert] stated, the "sooner the better."

The Holmeses also referred to the deposition testimony of their neurology expert. Crucially, however, the Holmeses do not cite to any record evidence showing that these experts explained what role, if any, Olivos's allegedly negligent reading of the CT scan played in the development of Michael's postoperative complications. Although the Holmeses are correct that "absolute certainty" is not required, *some* evidence is, and the record presented is insufficient to provide any basis for a determination that Olivos's conduct played a role in Michael's injuries.

[¶20] Nearly twenty years ago, we stated,

[R]easonable foreseeability does not equal causation. To support a finding of proximate cause, there must be some evidence indicating that a foreseeable injury did in fact result from the negligence.

Proximate cause is generally a question of fact for the jury, but the court has a duty to direct a verdict for the defendant if the jury's deliberation rests only on speculation or conjecture.

For purposes of our analysis here, [the doctor's] negligence is established. We assume also that [the doctor's] negligence created a reasonably foreseeable risk of [the patient's] damages. The issue is whether there is sufficient evidence to establish that it is more likely than not that [the doctor's] negligence played a substantial part in bringing about [the patient's] extended period of pain and [damages].

*Merriam*, 2000 ME 159, ¶¶ 9-11, 757 A.2d 778 (citations omitted). Here, the summary judgment record is devoid of evidence linking Olivos's conduct to the injury sustained by Michael or evidence that might allow a jury to parse out to what degree the delay in time caused or exacerbated any of the complications he suffered. *See id.* ¶¶ 8, 17; *McAfee ex rel. McAfee v. Baptist Med. Ctr.*, 641 So. 2d 265, 268 (Ala. 1994) (explaining that an expert's opinion that "'time is of the essence'" does not "rise to the level of substantial evidence" needed to prove causation); *Maudsley v. Pederson*, 676 N.W. 2d 8, 14 (Minn. Ct. App. 2004) ("The conclusory statements that generally earlier treatment results in better outcomes and that every hour counts fail to outline specific details explaining how and why [the] delay in treatment caused [the plaintiff's injury]. . . . [A] delay in diagnosis is not enough; if it were, expert testimony on causation would not be necessary.").

[¶21]   As the trial court correctly held, it would be "conjecture or speculation" to say that any negligence attributable to Olivos was the proximate cause of Michael's injuries. *See Grant*, 2016 ME 85, ¶ 12, 140 A.3d 1242; *Merriam*, 2000 ME 159, ¶¶ 8, 17, 757 A.2d 778; *Phillips*, 565 A.2d at 307; *Kava v. Van Wagner*, No. 1:07-CV-507, 2009 U.S. Dist. LEXIS 78905, at *20 (W.D. Mich. Sep. 3, 2009), *aff'd sub nom. Kava v. Peters*, 450 F. App'x 470 (6th Cir. 2011)

("Plaintiffs' evidence is too speculative because evidence of Plaintiff's inability or loss of opportunity to obtain a 'better outcome' provides no basis for a jury to award damages."). The court did not err in granting a summary judgment for Olivos and Spectrum. *See Grant*, 2016 ME 85, ¶ 12, 140 A.3d 1242; *Estate of Cabatit*, 2014 ME 133, ¶ 8, 105 A.3d 439; *Budge*, 2012 ME 122, ¶ 12, 55 A.3d 484.

[¶22]  There is no doubt that the Holmeses have suffered greatly from Michael's various medical ailments.  It is a plaintiff's burden, however, to make out a prima facie case for negligence; the Holmeses did not do so here, and thus they are not, as a matter of law, entitled to damages.

The entry is:

Judgments affirmed.

---

John P. Flynn, III, Esq. (orally), Flynn Law Office, LLC, Bowdoinham, for appellants Michael D. and Debra A. Holmes

Edward W. Gould, Esq. (orally), and Mariann Z. Malay, Esq., Gross, Minsky & Mogul, P.A., Bangor, for appellees Eastern Maine Medical Center and Michael St. Jean

Mark G. Lavoie, Esq., Christopher C. Taintor, Esq. (orally), and Joshua D. Hadiaris, Esq., Portland, for appellees Spectrum Medical Group and Guillermo Olivos

Penobscot County Superior Court docket number CV-2015-105
FOR CLERK REFERENCE ONLY